IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
PITTSBURGH

| | | |
|---|---|---|
| DANIEL DELLENBAUGH, | ) | |
| | ) | |
| Plaintiff, | ) | 2:18-CV-01108-CRE |
| | ) | |
| vs. | ) | |
| | ) | |
| LUCAS GOBRECHT, IN HIS OFFICIAL | ) | |
| CAPACITY AS POLICE OFFICER FOR | ) | |
| THE CITY OF PITTSBURGH AND IN HIS | ) | |
| INDIVIDUAL CAPACITY; GABRIEL | ) | |
| LAMBRIGHT, IN HIS OFFICIAL | ) | |
| CAPACITY AS POLICE OFFICER FOR | ) | |
| THE CITY OF PITTSBURGH AND IN HIS | ) | |
| INDIVIDUAL CAPACITY; MICHAEL | ) | |
| SOROCZAK, IN HIS OFFICIAL | ) | |
| CAPACITY AS POLICE OFFICER FOR | ) | |
| THE CITY OF PITTSBURGH AND IN HIS | ) | |
| INDIVUDAL CAPACITY; AND JEREMY | ) | |
| HURLEY, IN HIS OFFICIAL CAPACITY | ) | |
| AS K-9 AND POLICE OFFICER FOR THE | ) | |
| CITY OF PITTSBURGH, AND IN HIS | ) | |
| INDIVIDUAL CAPACITY; | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION[1]**

CYNTHIA REED EDDY, Chief United States Magistrate Judge.

## I.    INTRODUCTION

This action was initiated on August 20, 2018 by Plaintiff Daniel Dellenbaugh against

Defendant Officers Lucas Gobrecht, Jeremy Hurley, Gabriel Lambright, and Michael Soroczak

---

[1]     All parties have consented to jurisdiction before a United States Magistrate Judge; therefore the Court has the authority to decide dispositive motions, and to eventually enter final judgment. *See* 28 U.S.C. § 636, *et seq*.

alleging civil rights violations. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.  Presently pending before the court is Defendants' motion for summary judgment.  For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## II.    BACKGROUND

On August 20, 2016, an armed robbery occurred in the South Side area of the City of Pittsburgh where it was reported that the suspect was a tall, tan-complected male wearing a black t-shirt and tan shorts brandishing a silver pistol. The subject was not located.

During the same shift approximately at 2:33 a.m., Officer Gobrecht and his partner responded to a call of ten shots fired in Allentown near Mt. Washington. Once officers arrived on scene, Officer Gobrecht spoke with a potential witness, and then observed a dark colored Toyota speeding down the street which the witness recognized as the same vehicle involved in the shots fired call. The officers believed there were four occupants in the car and Officer Gobrecht observed the driver as wearing a black t-shirt with black hair and a goatee. Officer Gobrecht believed the driver to be Middle Eastern or Hispanic. Officer Gobrecht also observed that another occupant was wearing a white t-shirt but that was as much as he could see.

Officer Gobrecht and his partner gave pursuit of the Toyota and Officer Lambright and his partner joined in the pursuit.  The area of the earlier armed robbery report was geographically close to the area where the shots fired call occurred, leading the officers to believe the two calls were related. The officers eventually lost sight of the Toyota, and later received reports of a wrecked Toyota nearby.  Witnesses at the crash scene at approximately 2:50 a.m. reported that two white males, one wearing a white t-shirt and one wearing a red t-shirt ran away from the vehicle between the houses in the area.

Fifteen to twenty minutes after the call for the vehicle crash, Officer Lambright was in the Mt. Washington neighborhood of Pittsburgh, which is located between the South Side and Allentown neighborhoods, when he observed two white males sitting on some steps leading up to the front of a house.  According to Officer Lambright, one male had a black t-shirt slung over his shoulder and tan shorts, the other male had on a white t-shirt.

The two males were Plaintiff and his acquaintance Gilbert Porr. According to Officer Lambright both men were sweating profusely for the temperature of the night and seemed winded. Given the physical appearance of the males, and because their clothing loosely matched the description of the individuals put out over dispatch, Officer Lambright decided to stop his vehicle and talk to them further about the incident. In order to talk to Dellenbaugh and Porr, Officer Lambright pulled his marked police car in front of the two individuals to prevent them from running away. According to Officer Soroczak, all of the Defendant Officers were in uniform and marked police vehicles when they were around Plaintiff. Plaintiff disputes the officers had identification and police uniforms and alleges they did not use lights or sirens when they came upon him and Mr. Porr.

Officer Soroczak asked Plaintiff if he could speak with him. Plaintiff did not respond. Officer Soroczak stated "Stop. Police. Don't move." Plaintiff then ran past the Officers into a parking lot located off Natchez Street.  Officer Soroczak gave pursuit until Plaintiff hopped over a second fence and headed into a wooded area. Since Officer Soroczak had injured his hand on the first fence he hopped over while chasing Plaintiff, he did not feel comfortable pursuing Plaintiff further. Officer Soroczak also had concerns Plaintiff may be armed because he did not see Plaintiff's hands during the pursuit and because the men were suspected to have been involved in the shots fired report, as they roughly met the description of the suspects involved.  At this time,

3

Officer Soroczak lost sight of Plaintiff.

During the foot chase, Officer Lambright handcuffed Mr. Porr and questioned him concerning the car crash and shots fired call. Officer Lambright had no interaction with Plaintiff and could not see him from his location. At some point, Officer Lambright recognized that Plaintiff and Mr. Porr were not connected to the robbery, shots fired or car crash reports. It is unclear from the record if or when Officer Lambright reported that information to the officers pursuing Plaintiff.

Officers setup a perimeter behind the Shop 'N Save grocery store on Virginia Avenue where Plaintiff ran into the woods. Since the Officers believed Plaintiff was involved in the earlier armed car chase, they called in the K-9 to assist in the search. Officer Hurley who was on duty with his K-9 partner responded to the scene and was given information that he was wanted behind the back of the Shop 'N Save to apprehend a suspect who was involved in a shots fired incident earlier in the evening. Officer Hurley and his K-9 then entered the woods with Officer Deschon acting as lethal cover to apprehend Plaintiff. Officer Hurley located Plaintiff in the woods lying face down in brush with his arms visible but his hands beneath him. Plaintiff alleges that his hands were covering his face. Officer Hurley alleges that he shouted to Plaintiff that he should give up to which Plaintiff did not respond. Officer Hurley alleges he gave Plaintiff three more warnings before commanding the K-9 to engage. Plaintiff alleges that he heard men shouting but did not hear what they were saying.

Officer Hurley then moved in closer to Plaintiff and allowed the K-9 dog to move in, again alleging he shouted to Plaintiff to show his hands to no further response. Officer Hurley alleges that he shouted that this was the last warning and that if Plaintiff did not comply, he would be bitten. Plaintiff did not respond. Plaintiff alleges that he only heard "I found him, I'm sending the

dog in."   Believing Plaintiff to be armed, Officer Hurley commanded the K-9 to apprehend Plaintiff, at which point the K-9 engaged the back of Plaintiff's right knee.  Plaintiff then curled up into a ball and Officers Deschon and Hurley ordered Plaintiff to lay on his stomach and put his hands behind his back. At first, Plaintiff fought with the dog but then complied. Officer Hurley alleges that he did not see Plaintiff's hands until Plaintiff was complaint after the K-9 engaged him. Officer Hurley alleges that he did not know whether Plaintiff was armed or not when being apprehended.

The K-9 was trained to bite and remain engaged until otherwise ordered or manually disengaged.  The K-9 was manually disengaged after Plaintiff was handcuffed, which Defendants allege was for officer safety.  After the arrest, the Officers realized that Plaintiff did not have a firearm. Officer Gobrecht, who provided the description of the males involved in the earlier shots fired call, claims he arrested Plaintiff after he was apprehended. Officer Gobrecht did not encounter Plaintiff prior to him being handcuffed and brought of out the woods.  Plaintiff maintains that Officer Lambright handcuffed him upon apprehension.

After apprehension, Officers Gobrecht and Soroczak observed Plaintiff as belligerent and noticed an odor of alcohol on his breath, slurred speech and glassy eyes.  Plaintiff suffered a puncture injury to his leg. Plaintiff was then taken directly to the hospital to be treated for the police dog bite and was arraigned and released on bond.  Plaintiff was not administered a field sobriety test, a breathalyzer or a blood or urine test for alcohol or any controlled substances. Officer Gobrecht charged Plaintiff with Escape, Public Drunkenness, Disorderly Conduct, and Resisting Arrest.  After his arrest Plaintiff was no longer considered to be a suspect in the reports of armed robbery, vehicle pursuit with shots fired and was never charged with crimes related to those incidents.  Plaintiff was later found not guilty of all charges against him resulting from the

5

police pursuit.

Plaintiff alleges that on August 20, 2016, he drove to his friend's grandparent's house in the Mt. Washington area of Pittsburgh to have a drink in the South Side area. Plaintiff and Mr. Porr stayed at a bar until closing time and then walked back to the Mt. Washington area, at which point Plaintiff observed two cars pass him and park in front of him.

Plaintiff alleges that he could only see the head lights and taillights of each car. At that point, Plaintiff ran away towards an open bar playing music and headed into darkness after jumping two fences to avoid the individuals from the cars. Plaintiff alleges that he did not recognize the individuals as police officers. Plaintiff alleges that he ran because he was afraid of the neighborhood and did not recognize the cars as police cars and because Defendants did not identify themselves as police officers and believed he was going to be the victim of a crime.

Plaintiff went into the woods where he hid next to a tree. Plaintiff alleges that he was only in possession of a cell phone and did not make any calls. Plaintiff alleges that he did not see the officers wearing identification or in police uniforms. While hiding, Plaintiff alleges that he could hear people shouting but could not understand any words the men were shouting except for "I found him, I'm sending the dog in."  Plaintiff felt the dog bite his leg and thought the dog was a German Shepard at which point he screamed German commands at the dog.  At that point, Plaintiff realized the dog was a K-9 officer and complied. Plaintiff was arraigned at the hospital and never subject to incarceration.

Plaintiff subsequently filed this action alleging claims for, *inter alia*,[2] (1) malicious prosecution in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 against all of the

---

[2]     Plaintiff voluntarily dismissed claims related to municipal liability against the City of Pittsburgh, the City of Pittsburgh Bureau of Police and Pittsburgh Chief of Police. (ECF No. 28). Therefore, only the claims against the individual officers remain.

Defendants; (2) false arrest in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 against all of the Defendants; (3) a state law claim of assault and battery against Officer Hurley for releasing the K-9;[3] (4) excessive force and unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 against all of the Defendants.

## III.   STANDARD OF REVIEW

The standard for assessing a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is well-settled. A court should grant summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 250.

On a motion for summary judgment, the facts and the inferences to be drawn therefrom should be viewed in the light most favorable to the non-moving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Hudson v. Proctor & Gamble Paper Prod. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. County of*

---

[3]      Officer Hurley does not explicitly move for summary judgment as to Plaintiff's state law claims for assault and battery and therefore these claims remain.

*Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S at 247-48.  An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with respect to that issue. *Id*.  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'." *Matsushita*, 475 U.S. at 587; *Huston*, 568 F.3d at 104.

A plaintiff may not, however, rely solely on his complaint to defeat a summary judgment motion. *See, e.g., Anderson*, 477 U.S. at 256 ("Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."). Allegations made without any evidentiary support may be disregarded.  *Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000).

## IV. DISCUSSION

### a. Judicial Estoppel

First, Defendants argue that the doctrine of judicial estoppel prohibits Plaintiff from controverting the facts he stipulated to in the state court trial.  Specifically, Defendants argue that Plaintiff should be prevented from arguing that no reasonable prosecutor or law enforcement official could have believed that probable cause existed for Plaintiff's arrest, that Plaintiff did not fit the description of the individuals involved in the shots fired call or the earlier robbery, and that Defendant Officers misrepresented and concealed material facts from the District Attorney's Office because Plaintiff stipulated to a non-jury trial for his criminal charges in which the court considered police affidavits and reports and a preliminary hearing transcript.

Judicial estoppel is a sanction to bar "a litigant from asserting a position that is inconsistent

with one he or she previously took before a court or agency." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779 (3d Cir. 2001). "Summary judgment is appropriate when operation of judicial estoppel renders a litigant unable to state a prima facie case." *Id*.

Here, Defendants have failed to show how a prosecutor's arguments to the court in the non-jury trial that Plaintiff matched the actor description of the robbery or shots-fired call is "irreconcilably inconsistent" with Plaintiff stating that he did not match the description of the actor in connection with the robbery or shots fired call. *Id*. Moreover, Defendants have failed to meet their burden of showing how these statements render Plaintiff unable to state a prima facie case for any of his claims. Lastly, that Plaintiff stipulated to the admissibility of certain police documents for the court to consider in the underlying bench trial does not mean that he stipulated to the allegations set forth therein. Accordingly, Defendants' motion for summary judgment in this respect is denied.

b.  Malicious Prosecution

Next, Defendants argue that Plaintiff's malicious prosecution claim fails because Plaintiff has not suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding since he was arrested and taken directly to the hospital and then released.

Plaintiff's malicious prosecution claim under the Fourth Amendment requires the following five elements: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding. *Halsey v. Pfeiffer*, 750 F.3d 273, 296-97 (3d Cir. 2014). The type of deprivation of liberty that the Fourth Amendment contemplates in connection with a

malicious prosecution claim must be made because of a legal proceeding. Where the arrest is made without a warrant and occurs prior to the filing of a criminal complaint, and the arrestee is detained prior to commencing the legal process, such a detention is not a consequence of a legal proceeding. *Laufgas v. Patterson*, 206 F. App'x 196, 198 (3d Cir. 2006) (citing *Nieves v. McSweeney*, 241 F.3d 46, 54 (1st Cir.2001)). Likewise, Plaintiff's attendance at various pretrial hearings and his bench trial is not the type of constitutional injury the Fourth Amendment is intended to redress. *DiBella v. Borough of Beachwood*, 407 F.3d 599, 603 (3d Cir.2005) (""[t]he type of constitutional injury the Fourth Amendment is intended to redress is the deprivation of liberty accompanying prosecution, not prosecution itself."). *See also Laufgas*, 206 F. App'x at 198 (plaintiff's attendance at various hearings and bench trial was not a deprivation of liberty for Fourth Amendment malicious prosecution claim). Accordingly, Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claim.

      c.  <u>False Arrest</u>

Next, Defendants argue that Plaintiff's Fourth Amendment false arrest claim fails as a matter of law because Plaintiff failed to adduce evidence that Defendants initiated a legal proceeding without probable cause.

Plaintiff's claim for false arrest requires a showing that there was an arrest and that it was made without probable cause. *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012). "While the probable-cause standard is incapable of precise definition or quantification, all interpretations of probable cause require a belief of guilt that is reasonable, as opposed to certain. The probable cause inquiry is entirely objective, and the court must focus on the facts available to the arresting officer or prosecutor when the decision to initiate proceedings against a plaintiff is made." *Harvard v. Cesnalis*, --- F.3d ---, ---, No. 20-1012, 2020 WL 5200679, at *9 (3d Cir. Sept.

1, 2020) (internal quotation marks and citations omitted) (addressing probable cause standard for malicious prosecution and false arrest).  Where there is "a question of whether there was probable cause of the initiation of the criminal proceeding" or arrest, a court "should exercise caution before granting a defendant summary judgment" because "generally, the existence of probable cause is a factual issue." *Id*.

A claim for false arrest fails "if probable cause existed for any one of the crimes charged against the arrestee." *Dempsey v. Bucknell Univ*., 834 F.3d 457, 477 (3d Cir. 2016).  Relatedly, summary judgment on these claims is only appropriate "if no reasonable juror could find a lack of probable cause for **any** of the charged crimes." *Harvard*, at *4 (emphasis supplied).  Here, Plaintiff was charged with Escape, 18 Pa.C.S.A. § 5121, Public Drunkenness, 18 Pa.C.S.A. § 5505, Disorderly Conduct, 18 Pa.C.S.A. § 5503; and Resisting Arrest or Other Law Enforcement, 18 Pa. C.S.A. § 5104.  The court therefore must "assess whether any reasonable juror could find that" Plaintiff "lacked the requisite mental state for each of the crimes charged." *Id*.  If probable cause exists for even one of the charged offenses, Plaintiff's false arrest claim must fail. *Id*.  Each offense will be addressed separately.

### i.  *Disorderly Conduct*

Disorderly conduct occurs "if with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, [a person] (1) engages in fighting or threatening behavior, or in violent or tumultuous behavior; . . . or (4) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." 18 Pa.C.S.A. § 5503.  Defendant argues that because Plaintiff created a situation where multiple officers had to form a perimeter and use a K-9 to apprehend him, there was probable cause to arrest and prosecute him for disorderly conduct.

11

No reasonable juror could conclude that the Defendants lacked probable cause to arrest Plaintiff for disorderly conduct. The officers had a previous report of shots fired, a robbery and a car crash in which two men were seen fleeing from the scene. Officers came upon Plaintiff and Mr. Porr minutes within the crash being reported and who were in the vicinity of the crash and observed they were out of breath and sweaty. Upon conducting an investigative stop and asking to talk to Plaintiff, he immediately gave chase when approached. There was a fair probability that Plaintiff committed the crime of disorderly conduct by creating a hazardous condition that served no legitimate purpose by running through woods, hiding and requiring the use of a K-9 to apprehend him. While the officers were required to consider any plainly exculpatory evidence, the only exculpatory evidence here was that Plaintiff testified that he did not realize that they were police officers and thought he was going to be the victim of a crime and that is why he ran. However, Plaintiff's mental state is not at issue in the determination of probable cause. It is undisputed that the officers who arrived on the scene were in uniform and were driving marked police cars. The fact that Plaintiff did not recognize the persons as police officers or as driving marked vehicles is not a plainly exculpatory fact known to the officers at the time of arrest and need not be considered. Therefore, Defendants had probable cause to arrest Plaintiff for disorderly conduct.

       *ii. Resisting Arrest*

As to Plaintiff's claims for false arrest as to the charge for resisting arrest, no reasonable jury could conclude that Defendants lacked probable cause to arrest and charge Plaintiff with this offense. A person resists arrest under Pennsylvania law "if, with the intent of preventing a public servant from effecting a lawful arrest or discharging any other duty, the person creates a substantial risk of bodily injury to the public servant or anyone else, or employs means justifying or requiring

12

substantial force to overcome the resistance." 18 Pa.C.S.A. § 5104.   "[I]t is not criminal merely to 'flee arrest.'   However, where circumstances of the flight expose the pursuing officers to substantial danger, a conviction for resisting arrest is proper." *Com. v. Miller*, 475 A.2d 145, 146 (Pa. Super. 1984) (internal citations and quotation marks omitted).   No reasonable juror could conclude that the Officers lacked probable cause for resisting arrest.   Again, the Officers came upon Plaintiff who seemed out of breath and sweaty for the nightly conditions after reports of two men committing a robbery, shots fired and an eventual car crash and flee from the scene.   When Officer Soroczak approached Plaintiff to conduct an investigatory stop, which is part of an officer's official duties, Plaintiff gave chase.   It is undisputed that the officers were in uniform and were driving marked police cars.   The exculpatory evidence that Plaintiff points to is that he did not recognize the officers as police, thought he was going to be the victim of a crime and did not hear the officers' commands to show himself while hiding in the woods.   However, all of this is merely evidence of Plaintiff's mental state and is not proper for consideration in the determination of probable cause because this is not a plainly exculpatory fact known to the Officers at the time of arrest.   Plaintiff, by fleeing from the officers when they were conducting an investigatory stop, and his subsequent hiding in the woods required the officers to use a K-9 to overcome his resistance to police commands to show himself.   Therefore, Defendants had probable cause to arrest Plaintiff for resisting arrest.

### iii.   Public Drunkenness

As to Plaintiff's claims for false arrest as to the charge for public drunkenness, no reasonable jury could conclude that Defendants lacked probable cause to arrest and charge Plaintiff with this offense.   Under Pennsylvania law, a person is guilty of public drunkenness if "he appears in any public place manifestly under the influence of alcohol or a controlled substance . . . to the

degree that he may endanger himself or other persons or property, or annoy persons in his vicinity." 18 Pa.C.S.A. § 5505.  Here, the only evidence that Defendants cite to is the fact that officers observed Plaintiff as intoxicated because of "the odor coming off of him, the bloodshot blurry eyes, and slurred speech." (ECF No. 56-3).  While it is problematic that Plaintiff was not given a field sobriety test, a breathalyzer or a blood or urine test for alcohol or any controlled substance, and even more so that he was held in custody at the hospital and the Defendants did not order administration of those tests, the failure to administer these tests does not negate that the Officers observed Plaintiff as intoxicated by an odor on his breath and by Plaintiff's general disposition. Officers observed Plaintiff's intoxication after he fled from an investigatory stop which endangered himself and the Officers. *See Vega v. Chief Matthew Nestor*, No. 4:06-CV-2287, 2012 WL 13162666, at *2 (M.D. Pa. Feb. 16, 2012); *Sargent v. Commonwealth of Pennsylvania*, No. 3:13-CV-00730, 2015 WL 2356906, at *4 (M.D. Pa. May 15, 2015).  Therefore, Defendants had probable cause to arrest Plaintiff for public drunkenness.

iv. *Escape*

As to Plaintiff's claim for false arrest as to the charge for escape, a reasonable jury could find that Defendants did not have probable cause to arrest and charge Plaintiff with this offense. Under Pennsylvania law, a person is guilty of escape "if he unlawfully removes himself from official detention," which includes "any ... detention for law enforcement purposes." 18 PA. CONS. STAT. § 5121 (a), (e); *see Williams v. City of York, Pennsylvania*, 967 F.3d 252, 263 (3d Cir. 2020).  Here, reasonable minds could differ as to whether probable cause existed to charge Plaintiff with escape, because Plaintiff was never officially detained by the officers prior to giving chase on foot.  Officer Soroczak was uniformed and came upon Plaintiff and stated "Hey, buddy, can I talk to you for a minute" before Plaintiff ran away.  Officer Soroczak then yelled "Stop.

Police. Don't move." Defendants argue that this statement constitutes official detention but does not cite to any legal authority for this proposition. Contrary to Defendants' argument, the Pennsylvania Superior Court found that under arguably worse circumstances that an officer making an investigatory stop who orders the individual to stop and that individual thereafter flees does not constitute official detention for purposes of charging that individual with escape under Pennsylvania law. *Com. v. Woody*, 2007 PA Super 368, ¶ 2, 939 A.2d 359, 361 (2007), *aff'd*, 601 Pa. 482, 974 A.2d 1163 (2009). In *Woody*, a police officer observed a parked car partially blocking the roadway and he walked up to the car and shined his flashlight into the window and observed two individuals in what the officer suspected to be engaged in sexual activity. *Id*. Upon seeing the police officer, the driver of the vehicle sped away from the scene and the officer followed, using his siren. *Id*. The driver then exited the car and a foot chase ensued until the individual was apprehended. *Id*. The officer yelled at the driver to "stop and get on the ground" prior to his arrest. *Id*. The driver was charged with escape under Pennsylvania law and on appeal he was acquitted from that charge. The court found that because the charge of escape was based entirely on the driver's failure to comply with the officer's instructions to "stop and get on the ground," when both individuals exited their cars prior to the foot chase, the driver was never detained by the officer. *Id. at* 363. Similarly here, Officer Soroczak yelled "Stop. Police. Don't move" at Plaintiff when he gave chase. This alone does not constitute official detention for a charge of escape under Pennsylvania law. Notwithstanding, because Defendants had probable cause to charge Plaintiff with Disorderly Conduct, Resisting Arrest and Public Drunkenness, his claim for false arrest under the Fourth Amendment must fail. *Harvard v. Cesnalis*, --- F.3d ---, ---, No. 20-1012, 2020 WL 5200679, at *9 (3d Cir. Sept. 1, 2020). Accordingly, Defendant's motion for summary judgment as it relates to Plaintiff's Fourth Amendment claim for false arrest is granted.

a.  Qualified Immunity

Defendants next argue that they are entitled to qualified immunity.  As summary judgment is entered in favor of Defendants on a number of Plaintiff's claims, only those claims that remain will be discussed – *i.e.*, Plaintiff's excessive force claim.

Qualified immunity is a judicially created doctrine that shields certain public officials from civil liability for violations of civil rights as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation and quotation marks omitted). Qualified immunity applies if there is no constitutional violation under the facts of the case, or even if there is a constitutional violation, the law was not clearly established certifying that the alleged misconduct was unlawful at the time of the constitutional violation. *Id*. at 233.  A clearly established constitutional right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted).  This does not "require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011).  "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

i.  *Excessive Force Claim*

Lastly, Defendants argue that they are entitled to qualified immunity for Plaintiff's excessive force claim.  In response, Plaintiff does not indicate that he intends to allege excessive force claims against Defendant Officers Lambright, Gorbrecht, or Soroczak. *See* Pl.'s Br. (ECF No. 66) at 14 (only responding that these Defendants are not entitled to qualified immunity as to

false arrest and malicious prosecution claims).[4]  Plaintiff only responds that Defendant Officer Hurley is not entitled to qualified immunity on his excessive force claim, and the court will only address that claim.[5]

Claims that law enforcement officers used excessive force during the course of an arrest is analyzed under the Fourth Amendment "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. at 396.  This analysis "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id*. (alteration supplied).  Other factors to consider in determining the reasonableness of the force used includes "the duration of the [officer's] action, whether the action takes place in the context of effectuating an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Couden v. Duffy*, 446 F.3d 483, 497 (3d Cir. 2006).  The events

---

[4]     Even assuming that Plaintiff did not intend to discontinue his claims of excessive force against Defendant Officers Lambright, Gorbrecht or Soroczak, he has not properly explained with record evidence the personal involvement of any of these Officers in connection with any use of force.

[5]     While Plaintiff has seemingly discontinued any excessive force claims against Defendant Officer Lambright, the record is troubling insofar as Officer Lambright testified that during the investigatory stop with Mr. Porr, he concluded that Plaintiff and Mr. Porr were not involved in the robbery, shots fired or car accident incidents.  Officer Lambright could not remember whether he shared that exculpatory information with the other Officers who continued to attempt apprehension of Plaintiff with a K-9.  This certainly is relevant information to an officer in deciding to apprehend a suspect and how much force is necessary under the circumstances.  The court makes no determination of whether this constitutes a constitutional violation through a failure to intervene but notes the problematic nature of an acquiescence to share relevant exculpatory information.

surrounding the use of force must be considered from "the perspective of a reasonable officer on the scene." *Id.*

Officer Hurley was the K-9 handler who was called to the scene after a perimeter was established around Plaintiff in the wooded area. When Officer Hurley arrived on the scene, he was informed that Plaintiff could have been involved in an incident with shots fired and with an armed robbery earlier in the night. Officer Hurley searched the wooded area and located Plaintiff laying in the brush facedown with his hands beneath him. Plaintiff maintains that his arms were not hidden. Officer Hurley could not see Plaintiff's hands and did not know whether Plaintiff was armed. Officer Hurley gave Plaintiff multiple commands to show his hands. Plaintiff maintains that he did not hear those commands. Officer Hurley, believing Plaintiff was armed, then commanded the K-9 to apprehend and released the K-9 who then engaged Plaintiff in the back of the right knee. While at first, Plaintiff struggled with the K-9, he quickly complied and Officer Hurley permitted the K-9 to remain engaged until Plaintiff was handcuffed. Officer Hurley then manually removed the K-9 from Plaintiff.

Police officers are permitted to use a reasonable amount of force to effect an arrest; the degree of force is dictated by the suspect's behavior. *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004). This inquiry is made from "the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight…" with allowance for the "fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 396-397) (internal quotation marks omitted). "Use of a police dog to bite and hold a suspect is not *per se* unreasonable." *Moore v. Vangelo*, 222 F. App'x 167, 170 (3d Cir. 2007) (collecting cases). Further, there is no binding precedent that makes it objectively

unreasonable for an officer not to issue a verbal warning before releasing a police dog. *Id.* at 170 n. 2. Here, Plaintiff ran from officers, ignored commands to stop and hid in woods. Officers believed Plaintiff to be a suspect in the shots fired and armed robbery which took place earlier in the night, and it was objectively reasonable for Officer Hurley to conclude that Plaintiff was armed and required the use of a police dog to apprehend Plaintiff. Even assuming that Officer Hurley did not warn Plaintiff that he was sending in a police dog, this alone does not make the use of the police dog unreasonable. Officer Hurley believed Plaintiff to be possibly armed and volatile as evidenced from him running away from police, hiding, and ignoring police commands. The force used by Officer Hurley was objectively reasonable under the circumstances of the particular situation, and because Plaintiff has not stated a constitutional violation, Defendants' motion for summary judgment as it relates to Plaintiff's excessive force claim is granted.

## V.      CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment (ECF No. 55) is granted in part and denied in part. The following claims remain: state law claims for assault and battery against Officer Hurley. An appropriate order follows.

Dated: September 15, 2020.                                    By the Court,
                                                             s/ Cynthia Reed Eddy
                                                             Cynthia Reed Eddy
                                                             Chief United States Magistrate Judge


cc:      Counsel of record
         via CM/ECF electronic filing